*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court No. S-17269 ) |
| APRIL S. | ) Superior Court No. 3AN-18-02156 PR ) |
| | ) O P I N I O N ) |
| | ) No. 7572 – December 10, 2021 ) |
| _____ | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Peterson, Judge.

Appearances: Rachel E. Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for April S. Laura Fox, Senior Assistant Attorney General, and Laura Emily Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney. [Borghesan, Justice, not participating.]

MAASSEN, Justice.

## I.    INTRODUCTION

A minor in the custody of the Office of Children's Services (OCS) was brought to a hospital for mental health treatment. A hospital social worker then petitioned the superior court to have the minor involuntarily hospitalized at a psychiatric facility for a mental health evaluation. The court held a brief ex parte telephonic inquiry

at which it took the social worker's sworn testimony. The court concluded that the minor was a danger to herself and granted the petition.

Under the statute governing involuntary commitments, the court was required to hold an evidentiary hearing within 72 hours if the psychiatric facility intended to continue providing treatment beyond that time. Before any hearing, however, OCS informed the court that it consented to the minor's 30-day commitment for treatment; it contended that its consent made the 30-day commitment "voluntary" and, under the statute governing parental admissions, no hearing was required.

The court eventually held an evidentiary hearing nearly 30 days after the minor's initial hospitalization for evaluation. The court decided that the standards for a 30-day commitment were met because there was clear and convincing evidence that the minor had a mental illness, that she posed a risk of harm to herself, and that there were no less restrictive means of treatment available. The court also concluded that OCS had the statutory authority to admit a child in its care under the parental admissions statute. The first 30 days of the minor's commitment were therefore considered voluntary, and her continued hospitalization would be considered under the involuntary commitment framework only after those 30 days expired. The court further determined that, because the 30-day limit under the parental admission statute was separate from the 30-day limit before a jury trial was required under the involuntary commitment statute, the minor could be held for an additional 30 days — 60 days total — before there was any need for a trial.

The minor appeals. She argues that the superior court violated her due process rights by not allowing her to be heard at the initial inquiry, when the petitioner testified under oath, and by treating her initial 30-day commitment as voluntary. We conclude that the minor's hospitalization for evaluation complied with due process; a hearing is not required at the ex parte review stage, and a judge's decision to hold a brief

inquiry with the petitioner does not give the respondent a right to be heard. But we further conclude that it was error to treat the initial 30-day commitment as voluntary, because OCS is not a parent or guardian statutorily authorized to use the voluntary parental admission framework. Because the 30-day commitment should have been considered involuntary, any further hospitalization could not be ordered absent a full hearing or jury trial. We therefore reverse the superior court order characterizing the first 30-day commitment as voluntary and authorizing an additional 30 days of commitment.

## II.     FACTS AND PROCEEDINGS

### A.     Proceedings

This case concerns the 2018 involuntary hospitalization for mental health evaluation, and the subsequent commitment for treatment, of then 16-year-old April S.[1] As the subject of an ongoing child in need of aid (CINA) case, April was in temporary OCS custody and living in a group foster home. On August 15 she was brought to the Alaska Native Medical Center. OCS reported that she had sneaked out of the home and upon her return tested positive for methamphetamine and cannabis.

Hospital staff placed April under emergency detention on grounds that she was "[l]ikely to cause serious harm to self," noting OCS's allegations that she ran away from the group home, admitted to drug use, and had made "escalating threats" of suicide. Late that afternoon a hospital social worker filed a petition for an order authorizing April's involuntary hospitalization for a mental health evaluation at the Alaska Psychiatric Institute (API), citing her high-risk behaviors. The superior court almost immediately conducted a brief telephonic inquiry of the social worker, whom the court swore in as a witness. April was not in attendance.

---

[1]     We use a pseudonym to protect the respondent's privacy.

The social worker testified that April's OCS caseworkers were concerned that she was "putting herself in high-risk situations" and they believed "she needed a higher level of care than foster care." The social worker explained that she had tried placing April at one treatment center that rejected her based on her past history of "aggressiveness and disruptiveness during [a previous] hospitalization," and API seemed to be the best available alternative. The social worker described other aspects of April's history, including running away from a facility in another state, being kicked out of a group home for behavioral issues, and being "pretty much homeless" for several months. The social worker testified that although April had denied any suicidal intent, she was non-cooperative and agitated. She testified that OCS did not believe April could be kept safe and secure at her group home. She also noted April's psychiatric diagnoses: "conduct disorder, stimulant use, parent-child conflict, ADHD, PTSD, oppositional defiant disorder, intermittent explosive disorder," and "pervasive developmental disorder."

The court granted the order authorizing hospitalization for evaluation, concluding that there was probable cause to believe that April was mentally ill and gravely disabled. The court found that April was "experiencing symptoms and behaviors consistent with" her previous diagnoses and was likely to run away and engage in risky behaviors including substance abuse and vulnerability to trafficking. The court concluded that there were "no less restrictive options and [April] need[ed] evaluation and assessment in a safe secure setting." A guardian ad litem — separate from the one already serving in the CINA case — was appointed the next day.[2]

---

[2] *See* AS 25.24.310(b) (authorizing court to appoint guardian ad litem to represent child's best interests "in any legal proceedings involving the child's welfare").

April was transferred to API five days later, on August 20. A 30-day commitment hearing was scheduled for August 22, then continued to the next day. Counsel for April and OCS were present, as was April's guardian ad litem. OCS informed the court that it had signed April into API "on a voluntary basis as the child's guardian" and therefore no hearing was necessary; voluntary admissions, as opposed to involuntary commitments, have no statutory hearing requirement.[3] April objected, arguing that she was entitled to a hearing "no matter who has signed her in, within 30 days under the U.S. constitutional case law." The court agreed to the parties' suggestion that they set a hearing in a week to give April's parents the opportunity to participate and have attorneys present.

The parties reconvened on August 27 for a status hearing; April's father was also in attendance. The parties again disagreed what framework should be applied to April's commitment because of the concurrent CINA proceedings. April's attorney and her guardian ad litem both argued that she was entitled to a hearing under a CINA statute, AS 47.10.087, which governs OCS's placement of a child in its custody "in a secure residential psychiatric treatment center"; the State countered that API was a different type of facility — a psychiatric hospital — not covered by the statute. The issue was not resolved, but, working with the attorneys' schedules, the court set a consolidated evidentiary hearing for September 17.

The September hearing included the same parties as well as April's guardian ad litem from the CINA case, the attorneys who were representing her parents

---

[3]     *Compare* AS 47.30.690 (providing for admission of minor upon consent of minor's parent or guardian and supporting opinion of health care professional, with hearing required only if guardian ad litem later determines placement was "not appropriate"), *with* AS 47.30.735 (setting out requirements, including hearing, for 30-day involuntary commitment).

in the CINA case, and an OCS case worker. The State's attorney informed the court that the State, April's parents, and her CINA guardian ad litem had agreed to continue the evidentiary hearing to October 5 in order to give April's parents' attorneys time to prepare. April's attorney reminded the court that her client had been at API for 27 days already, did not want to be there, and wanted a hearing soon. The court agreed that April was "entitled to a hearing" and expressed concern that it had not heard any evidence about why she was hospitalized. The State conceded that there was "a good argument" for a hearing "under a due process theory," but it reiterated its position that April had been voluntarily admitted under the parental admission statute, AS 47.30.690, and was not entitled to a hearing until the 30 days of voluntary admission expired and API decided whether to petition for an involuntary commitment.

The court scheduled a hearing for later that week, September 20, and told API to file an involuntary commitment petition in the meantime. API filed its petition two days later, on September 19. The parties also briefed the court on their interpretations of AS 47.30.690. April argued that OCS was not a "parent or guardian" permitted to use the statute; she contended that she was entitled to the same due process as an adult facing an involuntary commitment, which would include an immediate review hearing. Because the 30 days she had already spent at API were involuntary, she argued, she was entitled to a jury trial if API sought to keep her past September 22. The State countered that OCS had acted appropriately under the parental admission statute. Because the time April had already spent at API was voluntary, the State argued, the next step was to determine whether she should be involuntarily committed for 30 days; according to the State, no jury trial right was implicated.

The evidentiary hearing was held on September 21. After hearing testimony from April's caseworker, her psychiatric care provider at API, and April herself, the court issued a 30-day commitment order, finding that the State had

demonstrated by clear and convincing evidence that April had a mental illness, that she was likely to cause harm to herself or others, and that there was no available alternative that was less restrictive than API.

April renewed her argument that the time she had already spent in API with OCS's consent should be considered involuntary, and she asserted her right to a jury trial. The court decided, however, that the past 30 days had been voluntary under AS 47.30.690 and that the two statutory schemes — the parental admission statute and the involuntary commitment statute — created two distinct 30-day commitment periods. The court determined that the 30-day voluntary admission period ended on September 22 and the 30-day involuntary commitment period started the next day. It was thus only if April's commitment extended beyond October 22 that she had a right to a jury trial or full evidentiary hearing.

April appeals.

## III. STANDARD OF REVIEW

"This court applies its independent judgment to questions of law, which include . . . constitutional questions, and statutory construction. When reviewing questions of law, this court adopts 'the rule of law most persuasive in light of precedent, reason, and policy.' "[4]

## IV. DISCUSSION

### A. Two Statutory Schemes Are Implicated In This Case.

This appeal concerns two different hospitalization frameworks. The first involves involuntary commitment under AS 47.30.700-.815. Under this statutory scheme, a judge, "[u]pon petition of any adult, . . . shall immediately conduct a screening

---

[4] *In re Hospitalization of Heather R.*, 366 P.3d 530, 531-32 (Alaska 2016) (quoting *Nunamta Aulukestai v. State, Dep't of Nat. Res.*, 351 P.3d 1041, 1052 (Alaska 2015)).

investigation or direct a local mental health professional . . . to conduct a screening investigation" of the respondent.[5] Within 48 hours of the investigation's completion, the "judge may issue an ex parte order orally or in writing, stating that there is probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others."[6] A treatment facility receiving such an order "shall accept the order and the respondent for an evaluation period not to exceed 72 hours."[7] The facility must notify the court of the respondent's arrival, and the court must then schedule a 30-day commitment hearing "to be held if needed within 72 hours after the respondent's arrival."[8]

At the 30-day hearing the respondent has the right to attend and present evidence.[9] If at the conclusion of the hearing the court "finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled," then "the court may commit the respondent to a treatment facility for not more than 30 days."[10] "If the court finds that there is a viable less restrictive alternative available and that the respondent has been advised of and refused voluntary treatment through the alternative," then "the court may order the

---

[5]     AS 47.30.700; *see also* AS 47.30.775 (stating that "[t]he provisions of AS 47.30.700-47.30.815 apply to minors").

[6]     AS 47.30.700.

[7]     AS 47.30.715.

[8]     *Id.*

[9]     AS 47.30.735(b)(1)-(9).

[10]     AS 47.30.735(c).

less restrictive alternative treatment for not more than 30 days."[11] "[I]f commitment or other involuntary treatment beyond the 30 days is to be sought," then "the respondent has the right to a full hearing or jury trial," and the court must inform the respondent of this right.[12]

A different series of statutes, AS 47.30.670-.695, governs *voluntary* admissions for mental health treatment. Voluntary admissions include the admission of a minor with the consent of "the minor's parent or guardian." Under AS 47.30.690,

> (a) A minor under the age of 18 may be admitted for 30 days of evaluation, diagnosis, and treatment at a designated treatment facility if the minor's parent or guardian signs the admission papers and if, in the opinion of the professional person in charge,
>
> (1) the minor is gravely disabled or is suffering from mental illness and as a result is likely to cause serious harm to the minor or others;
>
> (2) there is no less restrictive alternative available for the minor's treatment; and
>
> (3) there is reason to believe that the minor's mental condition could be improved by the course of treatment or would deteriorate further if untreated.[13]

If the minor is admitted, a guardian ad litem is appointed to monitor the minor's best interests.[14] A guardian ad litem who determines that the admission was "not appropriate"

---

[11] AS 47.30.735(d).

[12] AS 47.30.735(e).

[13] AS 47.30.690(a).

[14] AS 47.30.690(b).

may seek appointment of an attorney to challenge it, and the court will hold a hearing.[15] Also, the treatment facility has the discretion to release the minor if it concludes that the criteria for admission are no longer met,[16] and the parent or guardian may withdraw the minor upon notice to the facility, which may challenge the withdrawal by initiating involuntary commitment proceedings under AS 47.30.700.[17]

April challenges the process she received under these two hospitalization frameworks. First, she argues that the court deviated from the involuntary commitment statutes — and violated her due process rights — during its initial inquiry at the ex parte review stage, when it chose to take testimony without giving her the opportunity to be heard. Second, April contends that OCS violated her due process rights when it used AS 47.30.690 to have her admitted for 30 days under the "voluntary admission" framework against her will and without judicial oversight. She argues that the statute "must be construed to give minors who oppose their admission a prompt review hearing," and that any admission pursuant to that statute must be considered involuntary for purposes of the requirements for further judicial review. She also argues that OCS should not be allowed to use the parental admission statute at all because OCS is not a "parent or guardian," as contemplated by the statute's express language.

## B. The Superior Court Did Not Deny April Due Process By Holding An Ex Parte Inquiry Before Granting The Evaluation Petition.

April first challenges the superior court's ex parte decision to order her hospitalization for a 72-hour evaluation period. Alaska Statute 47.30.700 requires the judge presented with an involuntary evaluation petition to "immediately conduct a

---

[15]     *Id.*

[16]     AS 47.30.690(c).

[17]     AS 47.30.695.

screening investigation or direct a local mental health professional . . . to conduct a screening investigation" of the respondent; then, within 48 hours, the judge "may issue an ex parte order orally or in writing" with findings justifying any determination that the person "is mentally ill" and as a result is "gravely disabled or . . . present[s] a likelihood of serious harm to self or others."[18] The court must then "appoint an attorney to represent the respondent."[19]

April concedes that this process is facially constitutional, but she contends it was unconstitutionally applied in her case.[20] She contends that the court violated her due process rights once it elected to take evidence without inviting her participation. But we conclude that the process April received complied with due process under our precedent upholding the petition for hospitalization framework.

### 1. Our decision in this case is controlled by *In re Daniel G.*

We have already decided that the procedures contemplated by the statute governing involuntary hospitalizations for evaluation comply with due process. In *In re Hospitalization of Daniel G.* the police took a minor to the hospital following reports that

---

[18]    AS 47.30.700(a).

[19]    *Id.*

[20]    A litigant may challenge a law's constitutionality in two different ways. A facial challenge alleges that the law is unconstitutional "as enacted"; we will uphold a facially challenged law "even if it might occasionally create constitutional problems in its application, as long as it 'has a plainly legitimate sweep.' " *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 1000 (Alaska 2019) (quoting *Planned Parenthood of the Great Nw. v. State*, 375 P.3d 1122, 1133 (Alaska 2016)). An as-applied challenge alleges that although the law may be consitutional in other circumstances, it is unconstitutional under the facts of the case. *State v. ACLU of Alaska*, 204 P.3d 364, 372 (Alaska 2009).

he was threatening suicide.[21] The hospital filed a petition to involuntarily hospitalize the minor for 72 hours for evaluation.[22] The magistrate judge granted the petition, relying on the sworn statements of hospital staff that the minor had a history of mental illness and had threatened violence against himself and his father.[23] The next day the superior court approved the magistrate judge's order and scheduled a 30-day review hearing.[24] The minor filed a motion to vacate the order granting the petition, arguing in part that his due process rights were violated because the order had been issued "ex parte without an emergency justification."[25] Later the same day the hospital discharged the minor, having concluded that he did not meet the statutory standards for hospitalization.[26] The superior court dismissed the minor's motion as moot, and the minor appealed.[27]

We addressed the merits of the minor's due process challenge,[28] evaluating the constitutionality of the process he received by considering the three factors articulated by the United States Supreme Court in *Mathews v. Eldridge*[29]:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such

---

[21]    320 P.3d 262, 264 (Alaska 2014).

[22]    *Id.*

[23]    *Id.* at 264-65.

[24]    *Id.* at 265.

[25]    *Id.*

[26]    *Id.*

[27]    *Id.*

[28]    *Id*. at 269.

[29]    424 U.S. 319 (1976).

interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[30]

We found that the minor had "an interest in an accurate and expedited emergency evaluation and prompt judicial review of his emergency detention and evaluation," and that his liberty interest was implicated at the moment he was involuntarily detained.[31] Next, we concluded that the risk of an erroneous deprivation was "relatively low" because the petition was filed by disinterested medical staff, was promptly reviewed by a magistrate judge, and requested a hold of no more than 72 hours.[32] We further observed that the procedure the minor received complied with the statutory requirements, and the minor was entitled to "a post-deprivation hearing with extensive procedural protections."[33] We noted that requiring a contested hearing at the involuntary hospitalization for evaluation stage would likely lengthen an unnecessary confinement and lead to a greater deprivation than would a quick ex parte review.[34]

We recognized the State's strong interest "in obtaining a prompt psychiatric evaluation of a respondent who has been detained on an emergency basis to determine if civil commitment is warranted" and that evaluation orders were necessary for the

---

[30]    *In re Daniel G.*, 320 P.3d at 271 (quoting *Mathews*, 424 U.S. at 334-35).

[31]    *Id.* at 271-72.

[32]    *Id.* at 272.

[33]    *Id.* at 272-73.

[34]    *Id.* at 273.

functioning of a civil commitment system.[35] Weighing all the factors, we concluded that a pre-evaluation hearing with counsel would provide little additional safeguards to the minor, and that the statutory scheme — encompassing the screening investigation and ex parte order — complied with due process.[36]

April argues that her case is distinguishable from *In re Daniel G.* in two ways. First, she argues that her circumstances did not rise to the same level of emergency as in *In re Daniel G.*, where the concern was suicide. She observes that although she may have been under the influence of drugs, she did return to the foster home on her own. This, in her view, demonstrates that any emergency had abated, which in turn means there was more of an opportunity for her to be heard before being hospitalized for a mental health evaluation.

But these arguments do not significantly distinguish April's case from *In re Daniel G.* There, we noted that the same *Mathews v. Eldridge* test applies "[w]hether or not there was an emergency situation at the time of the evaluation order."[37] And as in *In re Daniel G.*, the facts here do not clearly indicate the emergency had abated.[38] In authorizing April's involuntary hospitalization for evaluation, the court found that she was engaging in "risky behaviors including substance abuse" and that there were "significant safety concerns including the possibility of trafficking." It also concluded that April was "uncooperative and not able to contract for safety." These findings

---

[35]     *Id.*

[36]     *Id.*

[37]     *Id.* at 271.

[38]     *Id.* at 269-70 ("Other than the fact of being in custody, there is nothing in the record to indicate that the initial emergency had abated before the issuance of the evaluation order.").

implicate serious health concerns, which, as in *In re Daniel G.,* were only abated by April's hospitalization.

Second, April argues that the *Mathews* balancing must change when the court takes the time to question witnesses, as the court has decided to sacrifice speedy decision-making in order to gather more evidence. We reject this argument as well. In *In re Daniel G.* we reasoned that "a prompt evaluation under an expeditiously issued ex parte order is more likely to result in the prompt release of a respondent who does not meet the standards for commitment than a procedure under which a full psychiatric evaluation does not occur until after a contested hearing with counsel."[39] Here, even with the court's telephonic questioning of the social worker who filed the petition, there was "an expeditiously issued ex parte order." The inquiry was held about three hours after April was brought to the hospital. The brief inquiry did not so delay April's evaluation as to undermine the rationale for ex parte review, nor does it meaningfully distinguish her involuntary hospitalization process from that in *In re Daniel G.*

### 2. April's involuntary hospitalization for evaluation complies with due process under *Mathews* balancing.

We reach the same conclusion even if we assume that the telephonic inquiry warrants a new *Mathews* analysis of whether due process requires an "additional or substitute procedural safeguard" — i.e., including April in the court's inquiry of the social worker.[40] The first *Mathews* factor, the private interests at stake, is the same as we described it in *In re Daniel G.*: it encompasses both the liberty interest of not being involuntarily detained and the "interest in an accurate and expedited emergency

---

[39] *Id.* at 273.

[40] *Mathews v. Eldridge,* 424 U.S. 319, 334-35 (1976).

evaluation and prompt judicial review" after the involuntary detention begins.[41] The additional procedures sought would require appointing an attorney for April at the beginning of the ex parte inquiry instead of at the end of it, then scheduling a hearing which would also have to include her parents, who themselves would have a right to counsel. These same requirements in the parallel OCS proceedings caused a significant delay in April's commitment review; the first evidentiary hearing took place a month after her initial hospitalization for evaluation in part because of attorneys' scheduling conflicts. Requiring that the respondent be heard during the court's inquiry of the social worker would have undermined April's own interest in expedient review.

The second factor, the risk of erroneous deprivation with the current procedure and value of the additional safeguard, also weighs against requiring the respondent's involvement in the now ex parte process. The evaluation petition is reviewed by a neutral judge shortly after it is filed.[42] The involuntary hospitalization statute requires that the respondent be evaluated by the judge or by a medical professional at the judge's direction.[43] Requiring that the respondent be heard during an ex parte inquiry of the petitioner would provide little additional protection.

The third factor, the government's interest (including burdens that the additional procedure would require), also weighs against requiring that the respondent be included at that early stage. These interests include the "strong interest in obtaining a prompt psychiatric evaluation of a respondent who has been detained on an emergency basis to determine if civil commitment is warranted" and the "practical importance of

---

[41]    *In re Daniel G.*, 320 P.3d at 271-72.

[42]    *Id.* at 272; *see* AS 47.30.700(a).

[43]    AS 47.30.700; *In re Hospitalization of Paige M.*, 433 P.3d 1182, 1186 (Alaska 2018).

evaluation orders for the functioning of the civil commitment system."[44] What April suggests — that the court's ex parte inquiry of the petitioner should trigger a full hearing — creates an incentive to avoid any sort of ex parte inquiry at all, as the requirement to be heard would make it very difficult to complete the inquiry within the statutory 72-hour time frame. This would undermine the State's interest in prompt as well as accurate psychiatric review.

We conclude that the process April received — an immediate ex parte inquiry — complied with due process even though she was not given an opportunity to participate. Because April's initial hospitalization was consistent with due process, we affirm the initial evaluation order.

**C.    It Was Error To Determine That April's First 30 Days At API Were Voluntary.**

April also challenges the court's determination that her first 30-day commitment to API was voluntary because the admission was authorized by OCS as her custodian. April argues that in order for the parental admission statute, AS 47.30.690, to be constitutional, it "must be construed to give minors who oppose their admission a prompt review hearing and treat as involuntary the period of confinement." Alternatively, she argues that even if the statute is constitutional as written, it is unconstitutional as applied, and finally that the statute's plain language does not authorize OCS to use it. We agree with the latter point: that OCS is not a "parent or guardian" authorized to use AS 47.30.690 to admit children in its custody for mental health treatment. Because our decision can rest on statutory grounds, we do not reach April's constitutional arguments.[45]

---

[44]    *In re Daniel G.*, 320 P.3d at 273.

[45]    *See Alaska Fish & Wildlife Conservation Fund v. State*, 347 P.3d 97, 102
(continued...)

Under AS 47.30.690, "[a] minor under the age of 18 may be admitted for 30 days of evaluation, diagnosis, and treatment at a designated treatment facility if *the minor's parent or guardian* signs the admission papers."[46] The mental health chapter of Title 47 does not define "parent" or "guardian."[47] The State argues that OCS acts as the guardian of the children in its custody under the plain meaning of the term, and that narrowing the term to exclude OCS would negatively impact children whose parents' rights have been terminated or whose parents are otherwise failing to look out for their health and welfare.

OCS's authority over a child in its care is not unlimited; it is defined by the CINA statutes, AS 47.10.005-.990. The statutes provide that "[w]hen a child is committed . . . to the department, . . . a relationship of legal custody exists."[48] "This relationship imposes on the department . . . the responsibility of physical care and control of the child," which includes "the duty of providing the child with . . . medical care."[49] Because OCS's authority over a child's medical care is statutory, it is subject to statutory boundaries.

---

[45]     (...continued)
(Alaska 2015) ("If 'a case may be fairly decided on statutory grounds or on an alternative basis, we will not address the constitutional issues.' " (quoting *Wilber v. State, Com. Fisheries Entry Comm'n*, 187 P.3d 460, 465 (Alaska 2008))).

[46]     AS 47.30.690 (emphasis added).

[47]     AS 47.30.915.

[48]     AS 47.10.084.

[49]     *Id.*

The CINA statutes provide relevant definitions: " '[P]arent' means the biological or adoptive parent of the child"; [50] " 'guardian' means a natural person who is legally appointed guardian of the child by the court."[51] These definitions exclude OCS, which is neither a "biological or adoptive parent" nor "a natural person." And AS 47.10.084, the source of OCS's legal custody of April, differentiates between "the department" on the one hand and the "child's parents[] [or] guardian" on the other when discussing the responsibilities of each.[52] The statute's plain language thus persuades us that the legislature did not intend the authority of the "the department" to be synonymous with that of the child's parent or guardian. And there is nothing in AS 47.30.690 to indicate that the words "parent or guardian" are intended to be more encompassing in that context.

This is not to say that OCS cannot seek involuntary mental health treatment for children in its custody. An OCS social worker, like any other interested individual, may file a petition for involuntary commitment, as the hospital social worker did in this case.[53] What OCS may not do is classify an admission as "voluntary" by asserting an authority that is statutorily reserved for parents and guardians.

It was therefore error to classify April's commitment as initially voluntary under AS 47.30.690, the parental admission statute. April's commitment was involuntary from the start. Because OCS sought to continue her commitment past

---

[50]    AS 47.10.990(26).

[51]    AS 47.10.990(14).

[52]    AS 47.10.084.

[53]    AS 47.30.700. Another CINA statute, AS 47.10.087, allows the court to authorize placement of a child in OCS custody "in a secure residential psychiatric treatment center" under certain conditions. Neither party suggests that this statute is implicated in this appeal.

September 22 — longer than the 30 days allowed by AS 47.30.730 — it was required to seek a 90-day commitment order under AS 47.30.740. This triggered additional rights for April, including the right to a jury trial, as she asserted.[54] We therefore vacate the September 21 involuntary commitment order.

## V.    CONCLUSION

We AFFIRM the August 15 order authorizing hospitalization for evaluation. We VACATE the September 21 order authorizing a 30-day involuntary commitment.

---

[54]    AS 47.30.735(e); AS 47.30.745.