*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TULUKSAK NATIVE COMMUNITY, ) | |
| ) | Supreme Court No. S-18377 |
| Appellant, ) | |
| ) | Superior Court No. 4BE-21-00065 CN |
| v. ) | |
| ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF HEALTH AND SOCIAL ) | No. 7660 – June 2, 2023 |
| SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, and ) | |
| HANSON N., ) | |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Terrence Haas, Judge, and William T. Montgomery, Judge pro tem.

Appearances: David A. Case, 49th State Law, LLC, Soldotna, for Appellant. David A. Wilkinson, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska. Olena Kalytiak Davis, Anchorage, for Appellee Hanson N.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

HENDERSON, Justice.

## I. INTRODUCTION

After the Office of Children's Services (OCS) removed an Alaska Native child from his mother and placed him with a relative, the child experienced suicidal ideation and checked himself into a psychiatric facility. Following a period of seemingly voluntary care, OCS requested a hearing under AS 47.10.087 (.087) to place the child at an out-of-state secure residential psychiatric treatment facility.

The child's Tribe intervened and challenged the constitutionality of .087, the manner in which evidence was received, and alleged due process violations. The child joined in some of these objections. The superior court ordered the child placed at a secure residential psychiatric treatment facility per .087. The Tribe, but not the child, appealed the placement decision, contending primarily that the superior court erred in proceeding under .087 and in making its substantive findings, and plainly erred in authorizing placement pursuant to .087 without addressing the Indian Child Welfare Act's (ICWA) placement preferences.

We see no error in the court's application of .087 or its substantive findings, and we thus affirm the superior court's placement determination. We note with concern that the court failed to make required inquiries and findings related to ICWA's placement preferences. However, this did not amount to plain error. We do not reach the Tribe's other arguments as the Tribe has either waived them or lacks standing to raise them.

## II. FACTS AND PROCEEDINGS

### A. Facts

In August 2021 OCS filed an emergency petition for temporary custody of Hanson N.[1] Hanson was at that time a 15-year-old boy from Tuluksak. Hanson's father had died in December 2020, and OCS removed Hanson from his mother's care the day before filing the petition. A few weeks later Hanson's mother stipulated that

---

[1] A pseudonym is used to protect Hanson's privacy.

there was probable cause Hanson was a child in need of aid and that he should be removed from the home. The court entered a temporary custody order that affirmed the probable cause finding, identified that Hanson may be an Indian child,[2] and confirmed that he had been placed with an extended family member. Hanson's Tribe, Tuluksak Native Community (Tribe), intervened in October.

In early December Hanson, then living in Anchorage, voluntarily went to an emergency room and was routed to North Star Behavioral Hospital without any involvement of OCS or the court.[3] According to later testimony from a North Star employee, Hanson had had some sort of incident, became upset, took a rope and tied it around his neck, and then sought professional medical help.

On December 22 OCS filed a request for a hearing under .087.[4] The request indicated that Hanson was currently at North Star and would likely be there for more than 30 days. It also asserted that a review hearing should be conducted "within 30 days of his admission (by January 5, 2022)." OCS took this action apparently in compliance with a 2015 statewide injunction by a different superior court judge in a separate case. That injunction, which is not part of the record before us, purportedly

---

[2] ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). The definition of "Indian tribe," in turn, includes "any Alaska Native village as defined in section 1602(c) of Title 43." *Id.* § 1903(8).

[3] The record is unclear whether Hanson's mother or grandmother consented to him being checked into North Star. It is also unclear exactly how Hanson arrived at North Star. It is clear, however, that OCS was not involved with Hanson's original intake to North Star and only found out about it later.

[4] AS 47.10.087 allows a court to authorize OCS to place a child in its custody into a "secure residential psychiatric treatment center" if certain statutory mental health related conditions are met. AS 47.10.087(a). The statute also requires judicial review of an initial placement under subsection (a) at least once every 90 days. AS 47.10.087(b).

requires a hearing or judicial finding within 30 days of admission to North Star for any child in OCS custody.

### B. Proceedings

#### 1. Initial .087 hearing

On January 6, 2022, the court convened to address the .087 hearing request. The judge assigned to the case was unavailable, so a different judge presided over the hearing. It is unclear whether Hanson had been notified of the hearing. Hanson was not present nor was any attorney on his behalf.

Earlier that day the Tribe had filed a response to OCS's request for an .087 hearing. The response questioned whether .087 applied in light of Hanson's apparently voluntary admission to North Star. It also requested counsel be appointed for Hanson, and requested discovery. OCS recommended that the court make findings and then address the Tribe's response later. The Tribe then requested a continuance to obtain discovery. OCS countered that discovery would be difficult because many of Hanson's records could not be discovered unless Hanson waived his psychotherapist-patient privilege.

The court heard further arguments about whether to proceed. The parties disagreed about whether North Star could continue to hold Hanson for more than 30 days, what would happen if the court did not hold some sort of .087 hearing, and whether "provisional findings" were appropriate. Over the objection of the Tribe, the court indicated that it would proceed by making provisional findings that could later be "contested in a more full-blown hearing," that it was "not going into a long full dive into the placement of .087," that it planned to grant the Tribe's request for a continuance, and that the purpose of that day's proceedings was to hold "a hearing within the first 30 days to at least ensure that the child's placement at North Star is appropriate." The court appointed an attorney for Hanson and allowed OCS's witness, Mark Sabo, to testify. Sabo was one of Hanson's treatment providers at North Star.

After the court qualified Sabo without objection as a mental health professional, it heard his testimony regarding Hanson's condition. At the close of Sabo's testimony, OCS requested authorization to place Hanson at North Star for "a period exceeding 30 days." OCS contended that there was "clear, convincing evidence that [Hanson was] suffering from a mental illness and as a result, [was] likely to cause serious harm to himself." The Tribe objected to OCS's proposed findings and argued that there was "no evidence produced that [Hanson] couldn't be treated someplace else that was less restrictive." The Tribe further objected to Sabo's testimony regarding Hanson's mental health diagnoses and to Hanson's lack of representation at the hearing.

The court then made oral findings that Hanson was diagnosed with and suffering from major depressive disorder and that as a result he was likely to harm or kill himself,[5] that there was "no reasonably available, appropriate or less-restrictive alternative" for treatment,[6] and that Hanson needed "round-the-clock monitoring." The court further found that Hanson was suffering from suicidal ideation and that his condition could be improved by the course of treatment at North Star.[7] After the Tribe questioned the nature of the findings, the court stated that the findings were "not provisional" but that it was "only authorizing this for a limited time."

---

[5]     AS 47.10.087(a)(1) requires a finding that "the child is gravely disabled or is suffering from mental illness and, as a result, is likely to cause serious harm to the child or to another person."

[6]     AS 47.10.087(a)(2) requires a finding that "there is no reasonably available, appropriate, and less restrictive alternative for the child's treatment."

[7]     AS 47.10.087(a)(3) requires a finding that "there is reason to believe that the child's mental condition could be improved by the course of treatment or would deteriorate if untreated."

The court then scheduled the next hearing as "another .087 hearing" in front of the assigned judge. The court also directed discovery be produced five days prior to that hearing.

### 2. Continued .087 hearing

The next relevant hearing occurred on January 28 in front of the assigned judge.[8] Hanson was not present, and due to an agency administrative mistake he still did not have an appointed attorney. He had therefore not yet waived his psychotherapist-patient privilege and only non-privileged discovery had been sent out.

The Tribe again raised objections to the applicability of .087, to relying on the January 6 findings because of due process concerns, to OCS's witnesses testifying about unproduced materials, and to any out-of-state placement for Hanson. The Tribe also raised an equal protection argument, but the court declined to rule on any constitutional question without "substantially more briefing." The Tribe did not file any additional briefing about the constitutionality of .087. The court did not make any decisions regarding the Tribe's other objections. Ultimately, the court decided it could not proceed without Hanson or his attorney present.

### 3. Second continued hearing

The next hearing was held on February 2. By this point, OCS had confirmed that it would seek an out-of-state placement for Hanson. Counsel for Hanson appeared at this hearing but informed the court that he had only been assigned the day before, had not spoken to Hanson, and was not ready to proceed. He requested a

---

[8] There was also a hearing on January 10 during which Hanson's attorney still had not been assigned and Hanson's mother stipulated that there was clear and convincing evidence that Hanson was a child in need of aid under AS 47.10.011(9) (declaring child in need of aid due to neglect) and to removal findings. In order to remove an Indian child from the parents a court must find removal necessary to prevent imminent harm to the child or that being left in the custody of the parents would likely result in serious emotional or physical damage. CINA Rule 10(c)(3); 25 U.S.C. § 1912(e).

continuance. He stated that Hanson's position was that he did not wish to be moved out of state, did not wish to waive his psychotherapist-patient privilege, joined the Tribe's due process objections, and objected to allowing OCS's witness to testify without discovery.

The court continued the hearing for a brief period, and indicated that it would require expedited discovery and conduct an in-camera review of materials that might be privileged. The court left the initial .087 findings in place and ordered that Hanson not be transported out of state prior to the next hearing.

### 4.     Final .087 hearing

The parties reconvened on February 17. Present at this hearing were Hanson and his attorney, OCS, the Tribe, Hanson's mother and her attorney, and Sabo.

The hearing began with a discussion of discovery and the psychotherapist-patient privilege, which Hanson had waived the day before. Some records had been produced that day, and the court acknowledged that it had not followed its self-imposed timeline for in-camera review and any further release of discovery. The Tribe noted that recent treatment plans had not yet been disclosed.

The Tribe objected to Sabo testifying about any of the information not produced and requested that such information be precluded, that OCS be required to produce the actual authors of the records to appear for cross-examination, or that the matter be continued. OCS opposed a continuance because Hanson had been accepted at a facility and could be transferred there immediately but for the court's order keeping him at North Star. The court denied the Tribe's alternative requests for preclusion or to require particular psychologists or psychiatrists to testify. After further discussion, the Tribe withdrew its request for a continuance so long as it could "guess what is in the documents that [it does not] have" and as "long as [it is] not ambushed by somebody saying . . . something different." The court ultimately proceeded with the hearing "subject to the Tribe's ability to meet the evidence presented here."

OCS then moved to incorporate Sabo's testimony from the January 6 hearing. The court did not clearly indicate whether it was incorporating that testimony, but noted that it had listened to that hearing. The court proceeded throughout the hearing as if it were making initial findings under .087(a).

Sabo testified about Hanson's diagnosis and treatment. He began by testifying about information contained in a neuropsychological evaluation report prepared by Dr. Paul Craig, North Star's in-house neuropsychologist. This report indicated that Hanson had been diagnosed with major depressive disorder without psychosis, unspecified neuro-cognitive disorder, unspecified intellectual disability, attention deficit hyperactivity disorder, persistent depressive disorder, intermittent explosive disorder, alcohol use disorder, cannabis use disorder, inhalant use disorder, and generalized anxiety disorder. Of those diagnoses, the alcohol, cannabis, and inhalant use disorders were "reportedly in remission." The report also indicated that Hanson's "IQ" was below the first percentile. Sabo also reiterated his understanding of the circumstances of Hanson's arrival at North Star, including that Hanson had put a rope around his neck and reported having suicidal ideation. He verified that Hanson had made "several suicidal statements" while at North Star. He also testified about a recent incident when Hanson had gotten upset and punched the gym floor, injuring his hand. Sabo further reported other "incidents . . . where he's made threats to staff, threats to peers" and one incident when Hanson destroyed the toilet in his room. Sabo testified that Hanson was likely to cause serious harm to himself and others "without structure and monitoring" due to his mental illness.

Sabo then testified about Hanson's treatment regimen, which included individual therapy, group process therapy, art and recreation therapy, school, and psychiatric treatment several times a week. Sabo indicated that he saw Hanson about once a week, but had occasionally seen him multiple times a week.

Before Sabo could continue talking about Hanson's treatment plan, the Tribe objected. The Tribe argued that Sabo could not testify about the treatment plan

because "this is the core of the material that . . . w[as] not produced." The parties then discussed who had this treatment plan and why it had not been discovered. No party had a copy of the actual treatment plan that Sabo was referencing.

After additional discussion the court suggested, and the Tribe agreed to, a short delay. The Tribe also confirmed that it did not "want to continue [this hearing] 24 hours." The court determined that the most important thing was "[t]hat the information that [Sabo] is testifying to be available to the parties in order for them to be able to meet that evidence." The court thus ordered Sabo to describe the contents of his file so the parties could decide what records should be produced. Sabo complied. With the parties' agreement, the court ordered North Star to promptly produce specific additional documents.

In the meantime, OCS called nurse consultant John Luchansky to testify about Hanson's proposed placement. Luchansky testified that North Star recommended residential treatment for Hanson, and that OCS was following this recommendation. He went on to describe how OCS and North Star seek residential treatment placements for minors. He then testified, over the Tribe's hearsay objection, about letters OCS had received from several facilities both in Alaska and out of state. In total, North Star had applied to nine facilities. Hanson's application had been denied at seven and accepted at two. Each of the seven facilities that denied Hanson's admission had done so because it could not provide the type or level of care Hanson required. Hanson had been accepted at facilities in Texas and Utah. During this process the Tribe again objected on hearsay grounds, and the court responded that the rules of evidence are not "strictly applied" at this type of hearing.

Luchansky indicated that OCS does not search for all facilities that may be available to a youth nationwide, but relies on the Department of Behavioral Health's list of placement facilities that are active Alaska Medicaid providers. He indicated that OCS does not specifically track any general effectiveness statistics for the facilities. He also generally described the benefits of residential treatment centers for minors like

Hanson, including how OCS might measure the effectiveness of the treatment through treatment plans, documentation, family contact, and weekly OCS contact to check on progress. He conceded that he was not aware of any tribally affiliated out-of-state facilities, and that he was unaware that the Indian Health Service maintained any list of tribally affiliated behavioral health services available nationwide.

After Luchansky's testimony, and as additional discovery continued to arrive in response to the court's order, the court allowed Sabo to continue testifying. Sabo testified that without medication and treatment Hanson was likely to commit suicide or assault his peers, and that his condition would deteriorate without care. He testified that he had no reason to disagree with the neuropsychological report that evaluated Hanson's risk of suicide, self-harm, accidental injury, and elopement as moderate, risk of assault as moderate to high, and risk of substance abuse relapse as high. He also testified that North Star was not an appropriate place for Hanson's long-term care, but that a residential program similar to the two that had accepted him would improve his condition. Sabo then described the type of structure and support that Hanson needed and the possible benefits of a residential program. Sabo also confirmed that when seeking out-of-state treatment facilities, North Star only considers those facilities that accept Alaska Medicaid. None of the reports that Sabo relied on to form his opinions were introduced into evidence, and some of them had either not been produced yet or had been produced during the hearing.

At the conclusion of the evidence, the parties made closing arguments and the court made oral findings on the record. The court found that it had credible direct testimony from a mental health professional that Hanson was currently suffering from a mental illness. The court also found that there were no reasonably available, appropriate, and less restrictive alternatives for Hanson's treatment. It noted that North Star was not an appropriate long-term placement for Hanson, that numerous attempts had been made to find and apply to long-term placements for Hanson, and that he had been denied admission to many of those programs. Finally, the court found that

-10- **7660**

Hanson's mental condition would benefit from a course of treatment at a residential facility. It observed that it did not know a great deal about the treatment available at the places Hanson had been accepted, and that obtaining an objective measure of effectiveness would likely be difficult. Nevertheless, the court found that OCS had "barely" met its burden regarding subsections 2 and 3 of .087. The court then went on to limit the out-of-state placement by requiring a review hearing at least every thirty days and requiring an OCS caseworker to visit Hanson at the out-of-state facility upon placement there. The court later restated its oral findings in a written order.

### 5. Appeal

The Tribe's appeal raises three primary points: (1) that the court erred by allowing placement of Hanson at a secure residential treatment facility without sufficient evidence, or based upon inadmissible evidence, and without making appropriate findings under ICWA or .087; (2) that the court erred by applying the wrong burden of proof; and (3) that .087 is unconstitutional as applied to this case.

## III. STANDARD OF REVIEW

We review the superior court's findings of fact for clear error.[9] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves [us] with a definite and firm conviction that a mistake has been made."[10] We review de novo whether those findings satisfy the requirements of the Child in Need of Aid (CINA) statutes and rules, and those of

---

[9] *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019).

[10] *Id.* (alteration in original) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526-27 (Alaska 2013)).

ICWA.[11]  "Rulings on discovery . . . are generally reviewed for abuse of discretion."[12]  Decisions to admit witness[13] or expert witness testimony are similarly reviewed for abuse of discretion.[14]  Issues not preserved in the superior court are reviewed for plain error.[15]  Plain error requires an "obvious mistake" that is "obviously prejudicial."[16]  Questions of statutory interpretation and constitutional law are reviewed de novo, and we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[17]

## IV.  DISCUSSION

We affirm the superior court's decision allowing placement of Hanson at a secure residential treatment facility.  First, the Tribe has identified no reason the court should not have proceeded under .087, which allows OCS to place a minor in its custody at a facility of the type at issue.  Next, because an .087 hearing is a type of CINA placement hearing, the court properly allowed certain hearsay and mental health testimony, and did not abuse its discretion in managing discovery.  Further, the court made sufficient findings related to each of the .087 statutory factors.  And under the circumstances, the court did not plainly err in failing to consider ICWA's placement preferences.  Finally, the Tribe's constitutional arguments are unavailing.  We address each of these points in turn.

---

[11]    *Id.*

[12]    *Lindbo v. Colaska, Inc.*, 414 P.3d 646, 650 (Alaska 2018).

[13]    *Id.*

[14]    *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1070 (Alaska 2018).

[15]    *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019).

[16]    *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[17]    *Kiva O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 408 P.3d 1181, 1185 (Alaska 2018).

### A. The Superior Court Did Not Err By Proceeding Under AS 47.10.087.

As it did to the superior court, the Tribe argues to us that .087 does not apply to Hanson's placement, and that the matter is instead controlled by Alaska's voluntary mental health commitment statutes in light of Hanson's initial voluntary admission to a hospital. The Tribe contends that our recent decision in *In re Hospitalization of April S.* requires as much.[18]

We disagree. While it appears that Hanson's admission to North Star was initially voluntary, it does not follow that OCS, as Hanson's legal custodian, *must* proceed under the voluntary or involuntary commitment statutory framework. Nothing in *April S.* requires the court to have proceeded differently in this matter. In *April S.* a minor in OCS custody was hospitalized for a mental health evaluation.[19] A series of delays resulted in her remaining hospitalized for close to 30 days without a hearing. At the subsequent 30-day commitment hearing, OCS argued and the superior court held that the first 30 days of her commitment were "voluntary" under AS 47.30.690.[20] We reversed and explained that the first 30 days of the minor's commitment were not, in fact, "voluntary" because OCS was not a "parent or guardian" as statutorily defined in AS 47.30.690.[21] We further held that OCS cannot *voluntarily* commit minors in its care.[22] Instead, OCS could either file a petition for involuntary commitment under AS 47.30.700 or seek placement in a secure residential treatment facility under .087.[23]

---

[18]    499 P.3d 1011 (Alaska 2021).

[19]    *Id.* at 1013-14.

[20]    *Id.* AS 47.30.690 allows a minor to be admitted for 30 days of mental health treatment at a "designated treatment facility" if a "parent or guardian" signs the admission papers. AS 47.30.690(a).

[21]    *In re April S.*, 499 P.3d at 1019-20.

[22]    *Id.*

[23]    *Id.* at 1020 & n.53.

Our holding in *April S.* prevents OCS from bypassing the findings required under either .087 or AS 47.30.700-.730 by claiming that a minor has been "voluntarily" committed under AS 47.30.690. As applied to Hanson's case, *April S.* confirms that OCS was within its purview to request an .087 hearing to place Hanson in a secure residential psychiatric treatment facility.

**B.**     **The Superior Court Did Not Err In Its Ultimate Handling Of The .087 Hearing.**

**1.**     **Because a hearing under .087 is a type of CINA placement hearing, it was not error to allow certain hearsay evidence.**

An .087 hearing is fundamentally a CINA placement hearing. It is the legal mechanism by which OCS places a child in its custody at a residential psychiatric treatment facility for long-term mental health care.[24]

When analyzing the process and rules that apply to .087 proceedings, we keep in mind that the CINA rules are generally constructed around a legislative intent to prioritize children's best interests.[25] This includes rules that sometimes favor informal hearings and prioritize efficiency. Among the Legislature's goals are those of expeditiously providing children with permanent homes and facilitating attachment between children and their caregivers.[26] For children needing intensive mental health services, it is important that OCS be able to efficiently place those children at facilities that provide appropriate levels of care.[27]

---

[24]     AS 47.10.087(c).

[25]     *See* AS 47.10.005; *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Michelle P.*, 411 P.3d 576, 582-83 (Alaska 2018).

[26]     AS 47.06.030(4)-(5); *see also* AS 47.10.005.

[27]     OCS is charged with a "duty to protect, nurture, train, and discipline the child" as well as a duty of "providing . . . food, shelter, education, and medical care." AS 47.10.084(a). Similarly, we have previously held that OCS has a "compelling interest . . . in providing adequate medical care" to a child in its custody. *Kiva O. v.*

Here, the Tribe contends that most, if not all, of the evidence presented by OCS at Hanson's .087 hearing consisted of improper hearsay statements or "conduit" evidence presented by Sabo. Without this evidence, the Tribe contends, there was insufficient evidence to support .087 findings. The Tribe primarily relies upon the premise that "the Rules of Evidence apply at all hearings, with enumerated exceptions," and contends that .087 hearings are not amongst the exceptions.

The superior court correctly rejected this argument given that an .087 hearing is best situated as a placement hearing.[28] While the Tribe correctly points out that .087 hearings are similar in several respects to commitment hearings,[29] these placement hearings implicate fundamental CINA considerations that allow for and at times require less formal procedures. The focus of the .087 hearing on placement, and the dispositional nature of the hearing, support less stringent hearsay standards consistent with CINA Rule 17. We therefore conclude that hearsay may be admissible in .087 proceedings as long as it is probative of a material fact, has circumstantial guarantees of trustworthiness, and the appearing parties are given a fair opportunity to meet it.[30]

---

*State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 408 P.3d 1181, 1188 (Alaska 2018).

[28] An .087 hearing could appropriately fit under CINA Rule 10.1 "Out-of-Home Placement – Required Findings." *See* CINA Rule 10.1. An .087 hearing could also be characterized as a "disposition hearing" under CINA Rule 17. *See* CINA Rule 17(a) (defining the purpose of the hearing "to determine the appropriate disposition of a child who has been adjudicated a child in need of aid"). The distinction is not important regarding hearsay because hearsay is admissible at either.

[29] Notably, .087's provisions for the findings that must be made in order to place a minor at a secure residential treatment facility are quite similar to the elements that must be addressed under the statutory framework governing involuntary mental health commitments. *See, e.g.*, AS 47.30.700, .730, .735, .755.

[30] *See* CINA Rule 10(b)(3), 17(e).

**2.** **The superior court did not err or abuse its discretion by admitting the testimony of the mental health professional.**

The Tribe further contends that our decision in *Cora G. v. State, Department of Health & Social Services, Office of Children's Services* prohibits the mental health professional in this case from testifying about the opinions or diagnoses of other mental health professionals.[31] The Tribe contends that the "thrust of *Cora G.* is that any statute requiring the testimony of a[n] expert witness requires that expert to actually *testify* to the conclusions they themselves arrived at, rather than what other potentially qualified people stated in documents."

But our decision in *Cora G.* does not support as broad an argument. In *Cora G.* we held that OCS must affirmatively qualify an expert witness to address whether a child sustained "mental injury" due to his parents' conduct, because the applicable statute required such expert testimony.[32] The term "mental injury" is statutorily defined as "a serious injury to the child as evidenced by an observable and substantial impairment . . . and . . . is supported by the *opinion* of a *qualified expert witness*."[33] In *Cora G.* we specifically interpreted the term "qualified expert witness" to require OCS to "lay a foundation at trial to qualify a proposed witness and offer that witness as an expert for the specific issue in question."[34] The specific issue there was the existence of "mental injury" as required by AS 47.10.011(8).[35] While that witness could rely on information normally relied on by experts in that field, the witness's

---

[31] 461 P.3d 1265 (Alaska 2020).

[32] *Id*. at 1275, 1284.

[33] AS 47.17.290(10) (emphasis added).

[34] *Cora G.*, 461 P.3d at 1284.

[35] *Id*. at 1285 ("[I]n this limited context of a judge-tried CINA matter, it is legal error for a trial court not to expressly qualify an expert witness to testify about a child's mental injury under AS 47.10.011(8)(A) and AS 47.17.290(10).").

*opinion* on the existence of mental injury had to be the witness's own, and offered via that witness's testimony.[36]  We rejected OCS's attempt to establish mental injury by having a therapist who had not been qualified as an expert testify about the opinion of a non-testifying neuropsychologist.[37]

The statutory requirement at issue in *Cora G.* is not present in this case.[38] Indeed, section .087 requires only that the court's finding be "based on the testimony of a mental health professional."[39]  No party in this matter contested Sabo's qualification to testify as a mental health professional.[40]  As such, Sabo was able to reference the diagnoses and opinions of other professionals in conveying information and opinions about whether Hanson met the criteria for placement in a secure residential facility.[41]

This is not to say that any witness may testify as a "conduit" for any other mental health professional's opinion by simply reading that opinion into the record.

---

[36]     *Id.* at 1284-85.

[37]     *Id.* at 1285-87.

[38]     We also note that, unlike in this case, *Cora G.* involved a proceeding in which hearsay was inadmissible for the question at issue.  *See id.* 1273-74.  This further underscores *Cora G.*'s limited application to Hanson's hearing.

[39]     AS 47.10.087(a).

[40]     AS 47.10.990(21) (defining "mental health professional" as per AS 47.30.915(16), which includes licensed psychiatrists or physicians, clinical psychologists, trained and licensed psychological associates, licensed professional counselors, and licensed clinical social workers, among others).

[41]     *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1217 (Alaska 1991) ("Rule 703 explicitly allows an expert to rely on otherwise inadmissible evidence, so long as the material is of a type reasonably relied on by experts in the field.").  This includes hearsay and "information from other case workers."  *Id.* (first citing *Norris v. Gatts*, 738 P.2d 344, 349 (Alaska 1987); and then citing *In re J.R.B.*, 715 P.2d 1170, 1174 (Alaska 1986)).

The court as the trier of fact can reject such testimony if it is not sufficiently informed or credible enough to be meaningful, or if the opposing party lacks the opportunity to meet the proffered evidence through cross-examination or other means. But Hanson's case does not present a situation in which the testifying mental health professional lacked any independent knowledge of Hanson's condition and treatment and was simply reading from others' treatment notes and opinions. Sabo was part of Hanson's treatment team, and his provision of treatment was naturally informed by others' diagnoses, observations, and statements. Sabo used those opinions and diagnoses to fashion his own treatment of Hanson, as well as to inform his opinion.[42] The court did not err by allowing and relying on Sabo's testimony.

### 3. We see no abuse of discretion in the court's management of discovery.

The Tribe also contends that insufficient discovery prior to the .087 hearings violated both Hanson's and its own due process rights. The Tribe raised multiple discovery objections during the various hearings, but did not substantively argue the issue in its opening brief, relying primarily on a one-sentence argument that "Alaska's conception of 'due process' contemplates discovery" at an .087 hearing.

We have previously held that "[a] fair and meaningful hearing does entail adequate access to information requested in discovery."[43] This includes the discovery of expert reports to "eliminate surprise at trial, and . . . for full and effective cross-

---

[42] *Id.*; Alaska R. Evid. 703. We also note that much, if not all, of the objected-to hearsay here would have been admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment. Alaska R. Evid. 803(4).

[43] *Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 211 (Alaska 1999).

examination of opponents' expert witnesses."[44]  Regardless of whether in the criminal or civil context, however, the normal remedy for a discovery violation is a continuance.[45]  Exclusion of crucial evidence due to a discovery violation is not appropriate unless the violation was "willful."[46]  Ideally, all parties should possess all relevant information prior to litigating the questions posed under .087; however, we recognize that rapidly evolving situations may present obstacles to that ideal.

The superior court went to great lengths to ensure that the Tribe had enough discovery to, at a minimum, "meet" the testimony of Sabo.  This included continuing the January 28 and February 2 hearings, entering various orders for expedited discovery, engaging in extensive discussion about discovery and the application of the psychotherapist-patient privilege, and delaying the February 17 hearing to wait for additional discovery.  Ultimately, the court decided that the most important thing was "[t]hat the information that [Sabo] is testifying to be available to the parties in order for them to be able to meet that evidence."  To facilitate this, the court had Sabo describe in detail the entire medical record he was referring to during his testimony and ordered North Star to immediately produce additional documentation directly to the court.

The Tribe raises the lack of discovery primarily as a violation of Hanson's due process rights, but does not explain how it may assert standing to raise a constitutional due process argument on Hanson's behalf.  We address this point more fully later in this opinion.  The Tribe has not argued that the discovery issues violated its own due process rights, beyond stating that its inability to effectively cross-examine

---

[44]    *Sec. Indus., Inc. v. Fickus*, 439 P.2d 172, 180 (Alaska 1968).

[45]    *Bostic v. State*, 805 P.2d 344, 348 (Alaska 1991); *Russell v. Mun. of Anchorage*, 626 P.2d 586, 591 (Alaska 1981) ("It is well established that even an unintentional violation of Criminal Rule 16 normally entitles the defendant to a continuance.").

[46]    *Harris v. State*, 195 P.3d 161, 174 (Alaska 2008).

a witness constituted a due process violation. But the record shows that at the January 6 and February 17 hearings the Tribe vigorously and effectively cross-examined Sabo. The Tribe also does not explain how the partial discovery of Hanson's North Star records rendered it unable to "meet" Sabo's testimony or otherwise resulted in prejudice to the Tribe, particularly when the court announced that it would be revisiting the appropriateness of Hanson's placement at frequent intervals in further hearings.

In this instance, the appropriate remedy for the lack of full discovery would have been a brief continuance. The Tribe initially requested a continuance during the February 17 hearing to wait for additional treatment records. OCS opposed this request, and after further discussion the Tribe indicated that it could proceed with the disclosures that had been made as long as it was not surprised by testimony relating to materials that had not been disclosed. The court denied a continuance at that point, "subject to the Tribe's ability to meet the evidence presented." After still further discussion of discovery, the court proposed a short delay in an attempt to get some of the missing treatment records from North Star. The Tribe then withdrew its request for a continuance by stating that it did not "want to continue [the matter] 24 hours." The Tribe did not renew its request for a continuance after the court proposed the plan to obtain treatment records from North Star.

Given the court's numerous efforts to ensure that the parties were able to effectively meet Sabo's testimony, the lack of specific argument in the briefing about how partial discovery rendered any party unable to meet OCS's evidence, and the Tribe's withdrawal of its request for a further continuance during the February 17 hearing, we see no error requiring reversal or vacatur of the court's .087 findings. Rather, the record shows the superior court did its best to try to move discovery forward while balancing the need to litigate under a strict timeframe.

**4. The superior court applied the correct burden of proof.**

The Tribe argues that the superior court erred because it applied the wrong burden of proof. In particular, the Tribe argues that because the court found OCS had

"barely" met its burden as to some elements, the court must have used a "preponderance of the evidence" standard.

Section .087 does not specifically provide the applicable standard of proof, and the court did not explicitly say what standard it was applying in making its February 17 findings.[47] However, the nature of an .087 hearing, including its similarities to an involuntary mental commitment hearing, persuade us that a clear and convincing evidentiary standard is constitutionally appropriate and adequate.

In involuntary mental health commitment hearings, Alaska law requires the court to find by clear and convincing evidence that the respondent is mentally ill and as a result likely to cause harm to the respondent or others.[48] We note that the language of .087 closely tracks the language of the involuntary commitment statutes. Moreover, each statutory framework provides for placement in, or involuntary commitment to, a type of psychiatric treatment facility, significantly impacting the involved individual's liberty interests.

In the context of mental commitments, the United States Supreme Court has held that the preponderance of evidence standard does not meet the demands of due process and is therefore inadequate for civil commitment proceedings.[49] It has further held that any standard must "inform the factfinder that the proof must be greater than the preponderance . . . standard."[50] The Court proceeded to hold that a standard of "clear, unequivocal and convincing" was "constitutionally adequate" and that use of the term "unequivocal" was not constitutionally mandated.[51] The Court did not dictate a

---

[47] AS 47.10.087 (providing no standard of proof for findings).

[48] AS 47.30.735.

[49] *Addington v. Texas*, 441 U.S. 418, 432-33 (1979).

[50] *Id.*

[51] *Id.*

set standard, however, and left the "determination of the precise burden equal to or greater than the 'clear and convincing' standard" to be made as a "matter of state law."[52]

Regarding involuntary psychiatric care for minors, the United States Supreme Court has held that there must be an inquiry by a neutral factfinder "to determine whether the statutory requirements for admission are satisfied."[53] And some state courts have interpreted this inquiry to require evidence to a clear and convincing standard.[54] Some states also have a clear and convincing evidentiary standard written into their version of Alaska's .087 statute.[55]

---

[52] *Id.* at 433.

[53] *Parham v. J.R.*, 442 U.S. 584, 606 (1979).

[54] *See, e.g.*, *J.W. v. J.W.*, 890 So. 2d 337, 340 (Fla. Dist. App. 2004) (holding that proper standard of proof to commit dependent child to residential mental health treatment facility is clear and convincing evidence); *In re Commitment of N.N.*, 679 A.2d 1174, 1187 (N.J. 1996) (holding that involuntary commitment of minor under 14 requires showing by clear and convincing evidence of factors similar to AS 47.10.087); *In re S.R.*, 253 A.3d 907, 907, 913-16 (Vt. 2021) (interpreting Vermont statute similar to AS 47.10.087 as requiring "best interests" finding that requires "substantial evidence"); *In re F.C. III*, 2 A.3d 1201, 1219-20 (Pa. 2010) (holding that formal adversarial proceeding pursuant to clear and convincing standard was necessary to commit minor to involuntary drug treatment); *In re Monique H.*, No. 1 CA-JV 10-0005, 2010 WL 3057097, at *2 (Ariz. App. Aug. 5, 2010) (stating in non-precedential opinion that juvenile court must make findings to clear and convincing standard to send juvenile to residential treatment for mental health needs).

[55] *See, e.g.*, Ariz. Rev. Stat. § 8-273(F) (requiring clear and convincing evidence to send minor to residential treatment services); N.M. Stat. § 32A-6A-22(K) (requiring clear and convincing evidence to place minor in residential treatment); Ga. Code Ann. §§ 15-11-656(d), (g)(1) (requiring clear and convincing evidence to detain minor in secure or nonsecure residential treatment facility); Idaho R. Juv. Rule 54(h) (requiring courts to determine by clear and convincing evidence factors similar to AS 47.10.087 before ordering in-patient or residential treatment for minor).

While authority instructs that minors' rights are not always coextensive with those of adults,[56] we see no reason to apply a lesser standard of proof in the context of .087. Placing a child at a secure psychiatric facility implicates protected liberty interests to such a degree that a lesser standard would not be appropriate. To protect these interests and harmonize .087 with the requirements of commitment hearings, while also balancing CINA considerations, we hold that .087 findings must be made by clear and convincing evidence.

Here, all parties seem to agree that the clear and convincing standard is correct, and no party suggested or argued otherwise before the superior court. OCS explicitly referenced a clear and convincing standard at the initial January 6 hearing. The Tribe also referenced a clear and convincing standard when asked whether it had any objections to the court making the requested findings. No party argued about the standard of proof during the February 17 hearing. The Tribe asserts that because the court described the evidence as "barely" meeting the unstated standard, the court must have "believed that the appropriate standard of proof was 'preponderance of the evidence.'" But this does not logically follow. The court's statement that OCS "barely" met the standard could apply to any standard of proof. We therefore reject the argument that the court's use of the word "barely" indicated use of a preponderance standard.

---

[56] *See, e.g.*, *Treacy v. Mun. of Anchorage*, 91 P.3d 252, 265 n.60 (Alaska 2004) (noting that United States Supreme Court has "held that the rights of minors are not always coextensive with those of adults"); *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 945 (9th Cir. 1997) (holding that "minors' rights are not coextensive with the rights of adults because the state has a greater range of interests that justify the infringement").

We normally assume that the superior court has applied the correct standard and that it does not need to explicitly state the standard if there is no dispute.[57] During the hearings at issue no party disputed the burden of proof. On January 6 all of the parties explicitly proceeded under a clear and convincing standard. There is no indication that anyone thought or suggested differently at the February 17 hearing, and we presume that the court, having reviewed the January 6 proceedings, applied the same undisputed burden of proof. Moreover, as discussed below, because the evidence meets a clear and convincing standard we decline to reverse or vacate findings based solely on the court's failure to state the standard.

## C. The Court's .087 Findings Were Sufficient.

The Tribe's primary contention in challenging the sufficiency of the superior court's .087 findings is that the court relied upon inadmissible hearsay, and without this hearsay there was no evidence to make .087 findings. As discussed above, the court did not err or abuse its discretion by admitting Sabo's testimony. We therefore consider Sabo's complete testimony in deciding whether the court's .087 findings were sufficiently supported by evidence.[58]

---

[57] *Wasser & Winters Co. v. Ritchie Bros. Auctioneers (Am.), Inc.*, 185 P.3d 73, 83 (Alaska 2008).

[58] We do not consider Sabo's testimony at the January 6 hearing. The Tribe argues that Hanson's procedural due process rights were violated at the January 6 hearing after the court made .087 findings without Hanson or his attorney present. Hanson also briefly mentions that the January 6 hearing was procedurally flawed. However, the Tribe concedes that at the February 17 hearing the court proceeded under AS 47.10.087(a) and did not rely on the previous findings or evidence to make its February 17 findings. We proceed accordingly.

**1.** **There was clear and convincing evidence that Hanson was suffering from mental illness and likely to cause serious harm to himself or others.**

The first part of subsection .087(a) requires a finding that "the child is gravely disabled or is suffering from mental illness and, as a result, is likely to cause serious harm to the child or to another person."[59]  The Tribe, with Hanson joining, contends that the court did not have sufficient evidence to make this finding.

Sabo testified as a mental health professional that Hanson had been diagnosed with major depressive disorder without psychosis, unspecified neurocognitive disorder, unspecified intellectual disability, attention deficit hyperactivity disorder, persistent depressive disorder, intermittent explosive disorder, alcohol use disorder, cannabis use disorder, inhalant use disorder, and generalized anxiety disorder.  By the February 17 hearing, Hanson's alcohol, cannabis, and inhalant use disorders were reportedly in remission.  Sabo further indicated that he was meeting with Hanson sometimes multiple times a week for therapy.  He said that the treatment team (including himself) would normally review psychological notes and evaluations about twice a week to assist with treatment.  Sabo further testified that Hanson was assessed as being at a moderate risk of suicide, moderate risk of self-harm, moderate to high risk of assault, high risk of substance abuse relapse, and moderate risk of elopement.  Those risk factors were corroborated by behaviors Sabo either personally observed or learned from the treatment team.

Sabo recounted recent and specific instances in which Hanson consumed hand sanitizer, became quickly angry and punched the gym floor, and destroyed the toilet in his room.  He also noted an incident when Hanson assaulted one of his peers.  These incidents supported his general assertion that Hanson could become "emotionally

---

[59]  AS 47.10.087(a)(1).

dysregulated very quickly" and could get "very angry and aggressive" over relatively minor situations.

Sabo also testified specifically about Hanson's behaviors indicating a risk of self-harm. This included making "quite a few statements" that "he wanted to die, and kill himself." Hanson originally arrived at North Star after putting a rope around his neck and expressing suicidal thoughts. Sabo also told the court that for a time Hanson was on "one-to-one, where they have a staff with him at all times" and that Hanson was not allowed to sleep alone due to self-harm concerns. Sabo reiterated that Hanson was likely to cause serious harm to himself and others "without structure and monitoring, a lot of monitoring."

Considered as a whole, Sabo's testimony adequately supports the court's finding that Hanson was suffering from a mental illness and as a result was likely to cause harm to himself or others.[60]

> **2. There was clear and convincing evidence that no reasonably available, appropriate, and less restrictive treatment alternative was available.**

The second subsection of .087(a) requires a finding that "there is no reasonably available, appropriate, and less restrictive alternative for the child's treatment."[61] The Tribe did not directly argue on appeal that the superior court's

---

[60] The Tribe briefly argues that the court clearly erred because its written order suggested reliance on "medical records" in making this finding. The Tribe correctly points out that no medical records were admitted into evidence and therefore the court should not have relied on any records to support its findings. Again, however, the court's findings are sufficiently supported by Sabo's testimony. Thus, any reference to unadmitted medical records is harmless error. *Amy S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 440 P.3d 273, 279 (Alaska 2019) (We "disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case." (quoting *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016))).

[61] AS 47.10.087(a)(2).

findings on this point were insufficiently supported. But to the extent the Tribe's argument about the burden of proof suggests such a challenge, we address it. We also note that Hanson focuses on this point and argues that the court had insufficient information about his treatment objectives and the treatment offered by the out-of-state facilities in question to make a least restrictive finding.[62]

Although Hanson is correct that the evidence offered at the February 17 hearing did not include much information specific to the contemplated out-of-state facilities, there was sufficient evidence presented regarding Hanson's condition, significant treatment needs, and the treatment that could be provided by a longer-term residential facility like those in question to support the court's least restrictive alternative finding. Sabo testified that the treatment options available at North Star were not appropriate for Hanson. He said that Hanson required constant monitoring and a secure facility to prevent him from committing suicide, assaulting others, or leaving. Sabo also explained that Hanson needed a treatment facility that had "correct staffing for patients that may require . . . closer supervision" and "are set up for longer-term therapies." He testified regarding the components of Hanson's treatment program at North Star, noted various risk factors impacting Hanson, and opined that Hanson's risk of suicide, assault, and substance abuse relapse supported residential treatment. Sabo noted that the two facilities that had accepted Hanson could provide services that North Star could not, and that they were better "set up" for Hanson's needs. This testimony supports a finding that Hanson's needs could not be met in a less restrictive setting.

---

[62] "Least restrictive alternative" as applicable to AS 47.10.087 is defined as "mental health treatment facilities and conditions of treatment that (A) are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient; and (B) involve no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury." AS 47.30.915(14).

Moreover, OCS presented testimony that North Star had applied to at least seven other treatment facilities, and that each one had denied Hanson's admittance for various reasons related to Hanson needing a higher level of care than the facility could provide. This, at a minimum, suggested that Hanson's level of required care was not generally available and that the options for providing such care were limited.

The superior court also considered that out-of-state placement may present geographical restriction, opining that "the farther an Alaskan Native child is from an Alaskan Native village, or from their state, or thousands of miles by flight from the culture and people and environment to which they are accustomed, the more restrictive it is." We agree with the superior court's observation that sending Alaska Native children to far-flung treatment centers could be incredibly restrictive. It is for this reason, and as further discussed below, that ICWA creates a special framework for considering appropriate placement of Indian children, including a preference for institutions approved by an Indian tribe or operated by an Indian organization.

In this instance, however, the court did not clearly err in finding that there was no reasonably available, appropriate, and less restrictive alternative for treatment for Hanson. Given Sabo's testimony about Hanson's significant treatment needs, North Star's inability to meet those needs, the relative ability of a longer-term residential psychiatric facility to meet those needs, and the evidence that numerous less restrictive and in-state facilities denied him admission because they could not meet his extensive treatment needs, the court could permissibly conclude that there was no appropriate, less restrictive treatment option available.

### 3. There was clear and convincing evidence that Hanson's mental condition could be improved with treatment or would deteriorate without it.

The final subsection of .087(a) requires a finding that there is "reason to believe that the child's mental condition could be improved by the course of treatment

or would deteriorate if untreated."[63] Both the Tribe and Hanson argue that the court did not have sufficient evidence to make this finding.

In support of this factor, Sabo testified that without treatment he was concerned that Hanson would kill himself or assault others. He testified that Hanson had, in fact, already assaulted one of his peers. He also testified that Hanson would benefit from a treatment program that included more structure, psychotropic drug administration, closer supervision, support staff to help with Hanson's cognitive function levels, and the ability to provide long-term therapies. He did not think North Star could not meet these treatment needs. Nor could the seven psychiatric treatment facilities that did not accept Hanson. Sabo testified that Hanson's mental condition would deteriorate if left untreated, and that treatment at one of the two facilities that accepted him would improve his condition. He also provided various details about why those programs would benefit Hanson.

The Tribe and Hanson argue that because the court had no effectiveness or outcome data from either of the facilities that accepted Hanson, the court could not determine whether Hanson's condition would improve by the course of treatment. Similarly, they point to the lack of specific information about the facilities' available treatment modalities. But Sabo did offer unrebutted testimony generally about the type of treatment that Hanson required and the type of facility that could benefit Hanson. Sabo also confirmed that both the Texas and Utah facilities would be able to treat Hanson. The court apparently credited this testimony.

Nothing in .087 requires the court to delve into specific statistics related to particular facilities' effectiveness or success rates. Instead, the statute's breadth allows a court to find that a secure residential treatment facility generally offers the type

---

[63] AS 47.10.087(a)(3).

of treatment that would benefit a particular minor. The testimony in this case supports such a finding. We also point out that this subsection could be met by demonstrating *either* that Hanson's condition could be improved *or* that it would deteriorate if untreated.[64] Sabo offered clear and unambiguous testimony that without the proposed treatment Hanson would either injure himself or assault another, and that his condition would deteriorate. We see no clear error in the court's finding on this element.

**D. Section .087 Placement Hearings Involving Indian Children Implicate ICWA, But The Court's Failure To Apply ICWA Here Was Not Plain Error.**

The placement of Indian children is governed by ICWA.[65] Section 1915(b) controls "foster care or preadoptive placement" criteria and preferences.[66] It states in relevant part:

> Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

---

[64]    AS 47.10.087(a)(3).

[65]    25 U.S.C. §§ 1901-1923.

[66]    *Id*. § 1915(b). Sections of this statute were recently held unconstitutional. *Brackeen v. Haaland*, 994 F.3d 249, 267-68 (5th Cir. 2021) (en banc), *cert. granted*, 142 S.Ct. 1205 (2022). However, § 1915(b)(iv) was not considered in the context of equal protection claims, and the district court's ruling that § 1915(a)(3) and (b)(iii) violate equal protection was affirmed "without a precedential opinion." *Id*. At the time of publication of this opinion, the United States Supreme Court had accepted certiorari and heard oral argument in *Brackeen*, but has not issued an opinion regarding the validity of § 1915. *Brackeen*, 142 S.Ct. 1205 (2022) (granting *cert.*). We therefore proceed assuming its constitutionality.

(i) a member of the Indian child's extended family;
(ii) a foster home licensed, approved, or specified by the Indian child's tribe;
(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.[67]

The text of ICWA clearly states that "in *any* foster care . . . placement" the placement preferences must be followed.[68] The definition of "foster care placement" includes "*any* action" that removes a child from a parent for placement in an "*institution* . . . where the parent . . . cannot have the child returned upon demand."[69] Similarly, § 1916(b) requires that whenever an "Indian child is removed from a foster care home or institution for the purpose of further foster care . . . such placement shall be in accordance with the provisions of this chapter."[70]

An .087 hearing unquestionably implicates § 1915(b)'s placement preferences because "placing" a child at a secure residential psychiatric facility falls into the definition of a "foster care placement," and § 1916(b) further confirms that moving a child from one foster care placement to another implicates all applicable provisions of ICWA.[71]

---

[67] 25 U.S.C. § 1915(b).

[68] *Id.* (emphasis added).

[69] *Id.* § 1903(1)(i) (emphasis added).

[70] *Id.* § 1916(b).

[71] Alaska's CINA Rules also implicate ICWA. CINA Rule 10.1 requires courts to "inquire into and determine . . . whether the Department has complied with the placement requirements of 25 U.S.C. § 1915(b)" anytime the court is "authorizing an Indian Child's removal . . . or continuing a previous order authorizing removal." CINA Rule 10.1(b). Whether the court in this case was "authorizing removal" or

We remind courts that when OCS is attempting to place an Indian child at a secure residential psychiatric treatment facility under .087, ICWA placement preferences apply. Courts must therefore inquire and make findings regarding the placement preferences and any departure therefrom.[72]

### 1. No party raised an ICWA argument.

The Tribe argues on appeal that the superior court erred by not considering ICWA placement preferences when it approved OCS's request to transfer Hanson to an out-of-state residential psychiatric treatment facility.[73] But no party raised an ICWA argument before the superior court. At best, the Tribe indirectly raised the placement issue when questioning Luchansky. This brief line of questioning established only that Luchansky did not know about a list of tribally affiliated health services maintained by

---

"continuing an order authorizing removal" when it made .087 findings is not clear. This issue was not raised or briefed, and we do not address it here.

[72] 25 U.S.C. § 1915(b).

[73] Hanson does not join this argument; rather, Hanson argues for the first time in his appellee brief that additional removal findings, informed by the testimony of an ICWA-qualified expert, were necessary before he could be sent to an out-of-state facility. 25 U.S.C § 1912(e) provides that "no foster care placement may be ordered . . . in the absence of a determination . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." One reading of § 1912(e) would require additional removal findings at every change in placement because "no placement" can be ordered without them. Another reading would require removal findings only once, and then allow subsequent placement changes in accord with ICWA's placement preferences but without additional expert witness testimony and removal findings. We declined to address this issue in *April S.*, when the parties had agreed that § 1912(e)'s requirement for removal findings applied and we assumed, without deciding, that that was the case. 467 P.3d 1091, 1096-97 (Alaska 2020). Given that no party raised this issue before the superior court, and because the issue was not identified as a point on appeal and was raised only through Hanson's appellee brief, the argument and record related to this question are sparse and we decline to further address it here.

the Indian Health Service, and that OCS relied solely on a list of facilities participating in Alaska Medicaid. Similarly, in closing argument the Tribe obliquely mentioned placement preferences by arguing under .087(a)(2) that OCS had "decided that they're not going to send any Alaskan Native kids to lower 48 Native-run facilities who don't accept Alaska Medicaid." This argument, however, was framed and characterized as a "less restrictive alternative" argument under .087(a)(2), not as an ICWA placement argument.

Hanson also obliquely referenced placement preferences during closing argument. Specifically, he stated that for any out-of-state placement OCS must also "exhaust the options for a Tribally-affiliated or managed care facility." This argument is inaccurate and was also made in the context of an .087(a)(2) "least restrictive alternatives" argument.[74]

No party before the superior court directly raised ICWA, objected to the placement on ICWA grounds, or contended that the court need to address whether there was good cause to deviate from ICWA placement preferences. We therefore review for plain error.[75] Plain error requires an "obvious mistake" that is "obviously prejudicial."[76]

### 2. The court's failure to apply ICWA was not plain error.

It is clear that ICWA's placement preferences apply to questions of placement arising under .087. The court was required to inquire into and make findings about those preferences and any deviation from them. The court did not, and not doing so was an error.

---

[74] OCS must not necessarily "exhaust the options for a Tribally-affiliated" facility. Rather, OCS must show good cause for not sending a Native child to a tribally-affiliated facility. 25 U.S.C. § 1915(b). Showing good cause is not the same as exhausting all possible options.

[75] *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019).

[76] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

Notwithstanding this error, we do not find that Hanson or the Tribe was obviously prejudiced by the court's failure to inquire into or apply the ICWA placement preferences.  Because no party directly raised ICWA's placement preferences with the superior court, the record before us is sparse on details about whether in- or out-of-state tribally run or tribally affiliated institutions are available to Hanson and able to meet his needs.  Moreover, the available evidence indicates that relatively few facilities exist, tribally affiliated or not, that provide the level of care Hanson requires.  And despite the record lacking specifics on the existence (or not) of appropriate tribally run facilities, it is not *obvious* to us that application of ICWA's placement preferences would have changed the outcome.

Like the superior court, we are greatly concerned when Native children are sent to distant treatment facilities, far away from family, tribe, land, and customs. However, the record in this case does not provide us with grounds to conclude that the court's failure to address ICWA's placement preferences was obviously prejudicial. Therefore, the court did not plainly err in making its .087 findings and approving Hanson's out-of-state placement without inquiring into ICWA's placement preferences.

## E.    The Tribe's Constitutional Arguments Fail.

The Tribe briefly asserts on appeal that the superior court's application of .087 unconstitutionally deprives some minors, such as Hanson, of equal protection under the law, in that "some children get less protection than others."  The Tribe also raises various due process objections, apparently attempting to do so on Hanson's behalf.

### 1. The Tribe's equal protection argument was waived.

We have held that arguments not properly raised below are waived.[77] In *Eagle v. State, Department of Revenue*, we declined to address an equal protection argument because the appellant had only cursorily raised "difference in treatment" in the superior court, and then only made two mentions of equal protection in appellate briefs.[78]

Here, the Tribe briefly raised both facial and as-applied equal protection challenges to .087 during the January 28 hearing. The court responded by informing the Tribe that if it wanted to raise a constitutional challenge there would need to be "substantially more briefing." Later in the hearing, the court reiterated its position that it would not rule on the constitutionality of .087 generally unless it was "raised through further briefing" but that it would accept further argument on whether it applies "specifically in this context." The Tribe did not file any additional briefing about the constitutionality of .087.

At the February 2 hearing, the Tribe abandoned any facial challenge to .087 by stating "we're not – the issue where we – the Court would have asked to make up additional briefings would have been if we were making a facial challenge to .087, which we're not." The court then decided that it was "not going to rule on the constitutionality of the statute as written on those broad terms, saying, "I'm not willing to find that the language of .087 is inapplicable . . . . And so, that leaves us with the

---

[77] *See, e.g.*, *Eagle v. State, Dep't of Revenue*, 153 P.3d 976, 980-81 (Alaska 2007).

[78] *Id.*; *see also Rhodes v. Erion*, 189 P.3d 1051, 1055 (Alaska 2008) (holding equal protection argument waived); *Reid v. Williams*, 964 P.2d 453, 460 (Alaska 1998) (same).

*April S.* question only."[79]   The Tribe did not file any additional briefing about the constitutionality of .087, or make any additional constitutional argument during subsequent hearings.

Even if this were sufficient to preserve an as-applied equal protection argument for appeal, the Tribe failed to sufficiently brief the argument on appeal.  In its appellate briefs, the Tribe briefly argues that OCS has not sufficiently explained why minors in OCS custody placed at a treatment facility get "less protection" than minors that are "voluntarily committed."[80]  The remainder of the argument quotes the three-step process by which courts apply equal protection analysis, and then makes cursory statements about the liberty interests involved and about OCS not showing that it has a legitimate interest in providing one group of minors facing commitment with more rights than another.

As OCS observes, equal protection arguments require a developed record identifying the constitutional interests at stake, the strength of OCS's purposes in the statute, OCS's interests in applying different procedures, and the "means-ends" fit.  The Tribe has not addressed any of these arguments.  Similarly, the Tribe has failed to argue whether children in and out of OCS custody are "similarly situated" as is required for a

---

[79]   We understand the "*April S.* question" to be a reference to the Tribe's argument that .087 is the incorrect procedural vehicle given the facts of this case, not as an unconstitutional "as-applied" argument.

[80]   OCS does not bear the burden here, as the Tribe would be the party challenging the constitutionality of the statute.  *State v. Planned Parenthood of the Great N.W.*, 436 P.3d 984, 992 (Alaska 2019) ("A party raising a constitutional challenge to a statute bears the burden of demonstrating the constitutional violation.  A presumption of constitutionality applies, and doubts are resolved in favor of constitutionality." (quoting *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001))).

successful equal protection argument.[81] Because the Tribe's equal protection argument was questionably raised, and was inadequately briefed, we deem it waived.

## 2. The Tribe lacks standing to raise due process arguments on Hanson's behalf.

The Tribe's remaining constitutional arguments point to violations of Hanson's due process rights, not the Tribe's.[82] We have held that litigants generally lack standing to assert the constitutional rights of others.[83] For example, in *Keller v. French* we rejected the plaintiff's citizen-taxpayer standing because there was "another potential plaintiff more directly affected by the challenged conduct."[84] And in *R.J.M. v. State* we held that a father could not assert a violation of his children's due process rights where he "cite[d] no authority establishing his standing to assert violations of the children's constitutional rights," and made "no persuasive showing of potential prejudice to himself, and the record reveal[ed] none."[85]

---

[81] *State v. Schmidt*, 323 P.3d 647, 660 (Alaska 2014) ("Plaintiffs who assert equal protection violations 'must demonstrate that the challenged law treats similarly situated persons differently.' " (quoting *Alaska Civ. Liberties Union v. State*, 122 P.3d 781, 787 (Alaska 2005))).

[82] Hanson also asserts violations of his due process rights. Many of Hanson's arguments are addressed in our decision of the various points appealed by the Tribe. We note again, however, that Hanson did not appeal the superior court's findings or orders in this case. To the extent that Hanson, as an *appellee*, raises points or challenges that are distinct from points raised by the Tribe in its appeal, they are not properly before us for decision.

[83] *Keller v. French*, 205 P.3d 299, 304 (Alaska 2009).

[84] *Id.* at 302-04.

[85] 946 P.2d 855, 871 (Alaska 1997), *superseded by statute on other grounds*, ch. 99, §§ 1, 18, SLA 1998, *as recognized in Jerry B. v. Sally B.*, 377 P.3d 916, 925 n.24 (Alaska 2016).

This case is similar.  The Tribe makes no argument that it has standing to raise due process violations on behalf of Hanson.  Nor has it made any showing of how or why violations of Hanson's constitutional rights would implicate its own constitutional rights.  Additionally, Hanson was a party to this case and had the opportunity to bring his own due process appeal.  He did not.  While we have previously held that in some circumstances Tribes have standing to bring *parens patriae* claims on behalf of their children,[86] the Tribe here has not briefed or argued that it has standing on these grounds in this situation.  Having no argument before us that would establish the Tribe's standing, we decline to address the due process arguments raised by the Tribe on behalf of Hanson.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's findings and orders under AS 47.10.087.

---

[86]    *State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs. v. Native Vill. of Curyung*, 151 P.3d 388, 399-402 (Alaska 2006).